OPINION
{¶ 1} Daniel Hiles ("Hiles") appeals the July 12, 2002 judgment entry of the Trumbull County Court of Common Pleas denying Hiles' motion to suppress statements and any evidence obtained as a result of any of the statements. Hiles also appeals the October 11, 2002 entry of sentence upon his no contest plea. For the reasons set forth below, we affirm the decisions of the trial court in this matter.
 {¶ 2} In October 2001, Detectives Anthony Leshnack ("Leshnack") and Rick Tackett ("Tackett") were investigating several break-ins in Vienna Township. It was determined that a black bag, two t-shirts with an "ODG" logo on them, and cash was taken from one of the locations. Leshnack also recovered red fibers from some broken glass at another location. During his investigation, Leshnack received information from Niles city dispatch regarding a tip from a cab company about a suspicious individual being picked up at a Days Inn in Niles at 10:21 p.m. and dropped off near the vicinity of the break-ins. The tip also disclosed that the same individual was picked up in the vicinity of the break-ins at 5:41 a.m. and returned to the Days Inn.
 {¶ 3} The cab company further advised that the same individual was later taken to a Giant Eagle, whereon he entered the store with a black bag. When the person in question returned from the store, he did so without the bag. Upon further investigation, Leshnack was informed that the person in question was Hiles, who was staying at the Days Inn. Tackett retrieved the bag and the t-shirts from the Giant Eagle. Tackett also viewed videotape from the store, which showed Hiles carrying the bag into the store and emptying the contents into a "Coin Star."[1]
 {¶ 4} Armed with this information, Leshnack and Tackett unsuccessfully attempted to contact Hiles at his room at the Days Inn. The detectives were, however, able to locate Hiles at an apartment on Mauro Circle. Leshnack asked Hiles to step outside so that they could converse. Hiles refused. Leshnack then proceeded to arrest Hiles for breaking and entering. Upon his arrest, Hiles was read his Miranda rights by Leshnack and placed in Leshnack's car. Tackett then retrieved the black bag from his vehicle and placed it in Leshnack's vehicle.
 {¶ 5} After being placed in Leshnack's car, Hiles was asked if he was involved in the Vienna break-ins. Hiles admitted as such, but stated that he did not want to get into it at that time. The detectives asked for consent to search his room at the Days Inn. Hiles consented to such a search. The detectives and Hiles drove to the Days Inn. Since Hiles could not read, Leshnack read and explained the consent to search form to Hiles. Hiles proceeded to sign the form and, thus, consent to the search of his hotel room. The subsequent search revealed a red flannel jacket, which Leshnack believed matched the red fibers he retrieved from one of the crime scenes.
 {¶ 6} When the detectives returned to the car with the jacket, they asked Hiles if he now wished to speak to the detectives about the Vienna break-ins. Hiles proceeded to admit to the break-ins at Matthews High School, Olympic Dreams, and GSI. Hiles also volunteered information about numerous other break-ins. Leshnack issued Miranda warnings to Hiles for the second time and had him sign a waiver form. In doing so, Leshnack read each line to Hiles and had him initial each line. Hiles then admitted to a number of break-ins and offered to show the officers the various locations.
 {¶ 7} Upon conclusion of this tour, the detectives returned to the Sheriff's Department with Hiles. Hiles was given some food and then he was interviewed, which the detectives videotaped and audiotaped. Before conducting the interview, Hiles was, again, advised of his Miranda rights and he, again, signed a waiver form after being read and initialing each line. The subject of this interview was the break-ins at Olympic Dreams, Matthews High School, and GSI.
 {¶ 8} Upon completion of this interview, the detectives conducted a second interview regarding the numerous other break-ins to which Hiles admitted. Again, the interview was videotaped and audiotaped.
 {¶ 9} After the conclusion of the second interview, Hiles was taken to the county jail. Formal charges were filed on October 22, 2001. On October 23, 2001, Hiles initiated contact with Leshnack and Tackett. The detectives met with Hiles that same day. Hiles was, again, advised of his Miranda rights prior to making any statements to the detectives. Hiles admitted to the break-ins at Fairhaven. He also admitted to further break-ins and agreed to show the detectives the locations of these on the following day.
 {¶ 10} Prior to the tour on October 24, 2001, Hiles was advised of his Miranda rights and he signed a waiver form after being read and initialing each line. Hiles proceeded to show the detectives various other locations of his break-ins. Hiles was then taken back to the Sheriff's Department to give another statement. Again, the statement was videotaped and audiotaped. Before this third interview, Hiles was, again, advised of his Miranda rights and, again, he signed a waiver form after being read and initialing each line. The subject of this interview was the break-ins to which Hiles had just identified during this second tour.
 {¶ 11} Since Leshnack forgot to ask Hiles about break-ins that occurred at Fairhaven, a fourth interview was conducted. The same procedure was followed. The statement was videotaped and audiotaped. Hiles was, again, advised of his Miranda rights and, again, he signed a waiver form after being read and initialing each line. The fourth interview was then concluded.
 {¶ 12} Eventually, Hiles was indicted on November 21, 2001, on 14 counts of breaking and entering, one count of theft, five counts of possession of criminal tools, four counts of safecracking, and one count of attempted safecracking. On December 27, 2001, Hiles filed a motion to suppress all his statements and any evidence obtained as a result of these statements.
 {¶ 13} The court conducted a suppression hearing on January 25, 2002. At the hearing, Leshnack testified concerning the substance and nature of his encounters with Hiles. Leshnack testified that he never promised or threatened Hiles. Leshnack further testified that at no time throughout any of his encounters with Hiles did Hiles request an attorney or assert any of his Miranda rights. As a matter of fact, Leshnack testified that he advised Hiles of his Miranda rights and that he even specifically asked Hiles if he wanted an attorney, to which Hiles declined.
 {¶ 14} Hiles also testified at the suppression hearing. He stated that he was never threatened by the detectives and that no promises were made to him. Hiles, however, claimed that when he initially was advised of his Miranda rights, he asked for an attorney. He asserts that the detectives ignored his request. Hiles also claims that he requested an attorney at another point. Hiles stated that, again, his request was ignored.
 {¶ 15} On cross-examination, Hiles admitted that he was advised of his Miranda rights and signed each of the waivers proffered. Hiles further admitted that he understood each of his Miranda rights and that he asserted his Miranda rights at least once before. Hiles also testified that he had been to prison seven or eight times.
 {¶ 16} Thomas Koch ("Koch"), a program coordinator from Fairhaven who had worked with Hiles, testified that, as far as he knew, Hiles was truthful in nature. Koch also testified that he knew Hiles for less than a year.
 {¶ 17} On July 12, 2002, the trial court denied Hiles' motion to suppress. In so deciding, the trial court found that Hiles did not request an attorney and that Hiles' statements were not coerced. Thus, the trial court determined that Hiles understood his rights and that he voluntarily waived those rights.
 {¶ 18} Hiles pleaded no contest to all counts on July 17, 2002. The trial court then requested a pre-sentence investigation. On October 1, 2002, a sentencing hearing was conducted. The trial court sentenced Hiles to ten months on counts 1, 2, 3, 4, 6, 7, 9, and 22, and sixteen months on count 5, to run consecutively; ten months on counts 10, 14, 16, 18, 21, 23, and 24, to run concurrently with count 1; ten months on counts 15, 17, and 19, to run concurrently with count 4; and sixteen months on counts 8, 20, and 25, to run concurrently with count 5. Hiles' total sentence was ninety-six months. At the sentencing hearing the trial court stated:
 {¶ 19} "This Court must take into consideration the principles and purposes of sentencing under 2929.11 in order to sentence someone under these circumstances. The philosophy behind the sentencing structure is to punish the offender and protect the public from future crimes. The sentence must be commensurate with, but not demeaning, the seriousness of the offense. In looking at the criteria under 2929.12(B) for a more serious type of offense, there really is nothing listed there that causes these to be more serious offenses. Now, there's certainly nothing to cause these to be determined as less serious offenses. But furthermore, looking at the characteristics of recidivism, being more likely, under2929.12(D), this Court finds that history of his criminal past, that he's not responded to prior sanctions and that he's shown until now no substantial remorse for what he's done. He feels bad about being sentenced. These are all indicators of recidivism. In looking at the shortest and longest terms, the Court finds that under 2929.14(C) that this defendant poses the greatest threat for committing crimes in the future. And in further looking at consecutive sentences, they are necessary to protect the public and would not be disproportionate with the seriousness of the crime. And in particular, under 2929.14(E)(3), the offender's criminal history shows that consecutive terms are necessary to protect the public in light of his past.
 {¶ 20} "And I note for the record his past, which includes a prison sentence in 1977; a prison sentence in 1978, six-month county jail sentence in 1980; and 1982, he was sentenced two to five years; in `84, he was sent to prison for six more months; in `84 again for one year in prison; in `86 to 3 to 15 years in prison; and in `92 two years in prison where there was other concurrent sentences that were bogged into that. Again, he has a history of criminal offenses which make it, which would rebut any conceivable suggestion that community control sanctions would be appropriate in this case. Certainly he is not amenable to probation and it would demean the seriousness of the crime. You also have to look at the fact that these are felonies of the fifth degree and felonies of the fourth degree."
 {¶ 21} The trial court filed an entry of sentence on October 11, 2002. Hiles timely appealed and raises the following assignments of error:
 {¶ 22} "[1.] The trial court erred by denying the appellant's motion to suppress.
 {¶ 23} "[2.] The trial court's imposition of consecutive sentences upon appellant is contrary to law."
 {¶ 24} In his first assignment of error, Hiles argues that he unequivocally requested to speak to an attorney and that he was not permitted to do so. Thus, Hiles asserts that all of his statements and any evidence obtained as a result of the statements should be inadmissible. Hiles further argues that his statements were not voluntarily made because they were the result of coercive tactics of promising leniency.
 {¶ 25} The trial court acts as trier of fact at a suppression hearing and must weigh the evidence and judge the credibility of the witnesses. State v. Hill, 75 Ohio St.3d 195, 208, 1996-Ohio-222. Since the trial court is in the best position to resolve the factual issues,State v. Searls (1997), 118 Ohio App.3d 739, 741, citing State v. Mills
(1992), 62 Ohio St.3d 357, 366, an appellate court is bound to accept the trial court's factual determinations as long as they are supported by competent and credible evidence. Searls, 118 Ohio App.3d at 741. Once the appellate court accepts the trial court's factual determinations, the appellate court conducts a de novo review of the trial court's application of the law to these facts. Id.
 {¶ 26} In this case, there was conflicting testimony concerning whether Hiles requested an attorney. The trial judge obviously believed Leshnack's testimony was more credible than Hiles' testimony. Moreover, there was considerable evidence proffered to support the trial court's factual findings that Hiles' statements were not coerced and that he did not request an attorney. Hiles was advised of his Miranda rights at least seven times and he signed four Miranda rights waiver forms. Each one of these forms contained the following:
 {¶ 27} "* * *
 {¶ 28} "You have the right to talk to a lawyer for advice before we ask you any questions, and to have him with you during questioning.
 {¶ 29} "* * *
 {¶ 30} "If you decided to answer questions now without a lawyer present, you will still have the right to stop answering at any time. You also have the right to stop answering at any time until you talk to a lawyer.
 {¶ 31} "* * *
 {¶ 32} "No promises or threats have been made to me and no pressure or coercion of any kind has been used against me. * * *"
 {¶ 33} Further, Hiles has been arrested numerous times throughout his life and, thus, has experience with Miranda rights and waiving these rights. In fact, he has asserted his Miranda rights at least once in the past. In consideration of this evidence and granting the trial court due deference to its determination of the witnesses' credibility, there was competent and credible evidence to support the trial court's factual findings that Hiles' statements were not coerced and that he never requested an attorney. Since the trial court's factual determinations are supported by competent and credible evidence, thus, binding this court to accept these factual findings as accurate, we now must "independently determine as a matter of law whether the applicable legal standard has been satisfied." See State v. Burrows, 11th Dist. No. 2000-T-0089, 2002-Ohio-1961, 2002 Ohio App. LEXIS 1918, at *8, citing State v.Retherford (1994), 93 Ohio App.3d 586, 592.
 {¶ 34} Prior to an interrogation of a suspect in custody, the suspect must be advised of his right to remain silent and his right to an attorney. Miranda v. Arizona (1966), 384 U.S. 436, 444. A suspect may waive these rights, but the government has the burden of demonstrating that the waiver was knowingly and voluntarily made. Id. at 475 (citation omitted).
 {¶ 35} In this case, the only issue is whether Hiles' waiver of his Miranda rights was knowingly and voluntarily made.
 {¶ 36} Hiles was advised of and waived his Miranda rights at least seven times. He signed four Miranda rights waiver forms, initialing each line next to each Miranda right. Each interview was preceded by Hiles being advised of his Miranda rights and waiving same. Upon review of the interviews, there were no signs of coercion, threats, mistreatment or promises. As a matter of fact, Hiles admitted that he was neither promised anything by the detectives nor threatened by them. During his testimony, Hiles admitted further that he understood his rights at the time that he waived them. Hiles also has extensive experience in the legal system and with waiving or asserting his Miranda rights. See Johnson v. Zerbst
(1938), 304 U.S. 458, 464 ("The determination of whether there has been an intelligent waiver * * * must depend, in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused."). Thus, under the totality of the circumstances, State v. Smith (1991), 61 Ohio St.3d 284,288, the trial court did not err in finding Hiles' waiver of his Miranda rights to be knowing and voluntary. See State v. Gumm, 73 Ohio St.3d 413,429, 1995-Ohio-24.
 {¶ 37} Hiles statements were, therefore, admissible. Hence, Hiles' first assignment of error is overruled.
 {¶ 38} Hiles argues in his second assignment of error that since the trial court found that Hiles' crimes did not warrant imposition of the maximum sentences, "it is incomprehensible how the court could then find that consecutive sentences" are warranted.
 {¶ 39} In reviewing sentencing decisions of a trial court, an appellate court conducts a meaningful review of the sentence decision.State v. Comer, 99 Ohio St.3d 463, 2003-Ohio-4165, at ¶ 10. "`Meaningful review' means that an appellate court hearing an appeal of a felony sentence may modify or vacate the sentence and remand the matter to the trial court for resentencing if the court clearly and convincingly finds that the record does not support the sentence or that the sentence is otherwise contrary to law." Id., citing R.C. 2953.08.
 {¶ 40} "A court that sentences an offender for a felony shall be guided by the overriding purposes of felony sentencing. The overriding purposes of felony sentencing are to protect the public from future crime by the offender and others and to punish the offender. To achieve those purposes, the sentencing court shall consider the need for incapacitating the offender, deterring the offender and others from future crime, rehabilitating the offender, and making restitution to the victim of the offense, the public, or both." R.C. 2929.11(A).
 {¶ 41} R.C. 2929.12(B) enumerates numerous factors that would make an offense more serious, such as the extent of the injury or harm, the offender's relationship with the victim, and whether the crime was motivated by prejudice. The absence of these factors in no way makes an offense less serious. See R.C. 2929.12(C).
 {¶ 42} R.C. 2929.14(E)(4) requires the court to make three findings in order to sentence an offender to consecutive sentences: (1) consecutive sentences are "necessary to protect the public from future crime or to punish the offender, * * * [(2)] consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public, * * * [and (3)] [t]he offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender."
 {¶ 43} Since the factors in R.C. 2929.12(B) and the requirements of R.C. 2929.14(E)(4) are not related, these statutes are mutually exclusive. Thus, a finding that an offender's crimes do not satisfy any of the factors enumerated in R.C. 2929.12(B) does not preclude a finding by the trial court that these same crimes warrant the imposition of consecutive sentences as long as the requirements of R.C. 2929.14(E)(4) are met.
 {¶ 44} "[P]ursuant to R.C. 2929.14(E)(4) and 2929.19(B)(2)(c), when imposing consecutive sentences, a trial court is required to make the statutorily enumerated findings and give reasons supporting those findings at the sentencing hearing." Comer, 99 Ohio St.3d 463, at ¶ 20. Moreover, a trial court is required to make the same findings and reasons at the sentencing hearing when imposing a prison term for a felony of the fourth or fifth degree. R.C. 2929.19(B)(2)(a). Thus, we must conduct a meaningful review of the trial court's imposition of a prison term for the offenses because they were all felonies of the fourth and fifth degree. We must further conduct a meaningful review of the imposition of consecutive sentences.
 {¶ 45} An offender who has committed a felony of the fourth or fifth degree can be sentenced to prison if the offender previously served a prison term, R.C. 2929.13(B)(1)(g), and the trial court finds that the offender is not amenable to community control and that a prison term is consistent with the purposes and principles of sentencing. R.C.2929.13(B)(2)(a).
 {¶ 46} In this case, Hiles has previously served eight terms in prison and, therefore, is eligible for prison for the crimes for which he was charged. A review of the record reveals that the trial court made the necessary findings and gave its reasons for such. The trial court specifically found Hiles was not amenable to community control and a prison term would be consistent with the purposes of sentencing based on his extensive criminal history, the multitude of offenses to which he pleaded no contest, and his failure to respond to prior sanctions. Thus, we cannot clearly and convincingly find that the record does not support the imposition of a prison term for Hiles' fourth and fifth degree felonies.
 {¶ 47} "Consecutive sentences are reserved for the worst offenses and offenders." Comer, 99 Ohio St.3d 463, at ¶ 21 (citation omitted). Thus, in imposing consecutive sentences, the trial court must support its decision with specific findings as to all three requirements of R.C. 2929.14(E)(4). Id.
 {¶ 48} The trial court specifically found that each requirement of R.C. 2929.14(E)(4) was present. In support of its findings, the trial court stated at the sentencing hearing that its decision was based on Hiles' criminal past and lack of rehabilitation, the numerous felonies involved in this case to which Hiles has pleaded no contest, twenty-five in all, his likelihood of recidivism, and his lack of remorse. These factors clearly support the trial court's conclusion that consecutive prison terms are necessary to protect the public and punish the offender. They further support the trial court's conclusion that consecutive sentences, in this case, are not disproportionate to the extensive criminal conduct involved here and Hiles' subsequent danger to the public. Moreover, these findings substantiate the trial court's determination that Hiles' criminal history necessitates consecutive sentences to protect the public from future crimes.
 {¶ 49} Thus, we find that the trial court provided sufficient findings as to all three elements required to impose consecutive sentences. Cf. State v. Kase (Sept. 25, 1998), 11th Dist. No. 97-A-0083, 1998 Ohio App. LEXIS 4498, at *4-*5. We, therefore, cannot clearly and convincingly find that the record does not support Hiles' consecutive sentence or that the sentence is otherwise contrary to law. Hence, Hiles second assignment of error is overruled.
 {¶ 50} For the foregoing reasons, we hold that Hiles assignments of error are without merit. Thus, the decision and sentence of the Trumbull County Court of Common Pleas are affirmed.
Judgment affirmed.
JUDITH A. CHRISTLEY and CYNTHIA WESTCOTT RICE, JJ., concur.
[1] A "Coin Star" is a machine in which a person can deposit change and receive a voucher to convert the change into paper currency.